# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

02 APR 30  PM 3: 27

CARLOS B. TAYLOR,         )

             )        U.S. OF ALABAMA

        Plaintiff,    )

             )

v.                 )    CIVIL ACTION NO.  99-JEO-3263-S

             )

BOARD OF TRUSTEES OF THE   )

UNIVERSITY OF ALABAMA and THE )    **ENTERED**

UNIVERSITY OF ALABAMA AT   )

BIRMINGHAM,           )    APR 5 0 2002

             )

        Defendants.   )

## MEMORANDUM OPINION

In this action, plaintiff Carlos B. Taylor (hereinafter "Taylor" or "the plaintiff"), a former employee[1] of the Board of Trustees of the University of Alabama and the University of Alabama at Birmingham, (hereinafter "the University" or "the defendants"), originally asserted various claims of race discrimination against the defendants, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981a.  Presently before the court is the defendants' motion for summary judgment as to all of the claims (doc. 12) and the defendants' motion to strike certain of the plaintiff's evidence (doc. 16).  Upon due consideration, the court finds that the motion to strike is due to be granted in part and denied in part and that the motion for summary judgment is due to be granted.

## I.    PROCEDURAL BACKGROUND

When the plaintiff initially filed his complaint, he alleged various race discrimination claims, including disparate treatment in salary, job opportunities, promotions, and training;

---

[1] The parties have informed the court that the plaintiff no longer works for the defendants.

26

retaliation; and racial harassment. (Doc. 1). The defendants filed the pending motion for summary judgment on March 12, 2001, and submitted evidentiary material in support thereof. (Doc. 12). The plaintiff filed a brief in opposition to the defendants' motion and also submitted evidentiary material in support of his brief. (Doc. 15). The parties presented oral arguments on the issues at a hearing on February 15, 2002. Thereafter, the court permitted the parties an opportunity to submit supplemental evidence and arguments on various assertions made at the hearing by counsel. (See Doc. 22-25).[2]

## II.   FACTUAL SUMMARY[3]

The plaintiff is an African-American male who was employed by the defendants for over six years. (Doc. 12, Ex. A (Carlos Taylor Deposition (hereinafter "Taylor Depo.")), p. 9).[4] He was hired by Bill Higdon on December 27, 1995, as a Junior Accountant. (*Id.* at 9-10). This was approximately eight months after he graduated from the University of Alabama in Birmingham with an undergraduate degree in management. His starting salary was $21,611.00. (*Id.* at 44, 154). At the time of the filing of this lawsuit, the plaintiff held the position of Accountant with the defendants. (*Id.* at 9-10). At the time of his deposition in June 2000, he was making around $31,000 per year. (*Id.* at 44). Higdon was the plaintiff's direct supervisor while he was

---

[2] At the hearing, there was some indication that, prior to the plaintiff's application for the senior account positions that are at issue in this litigation, the plaintiff had applied for a position supervised by Denise Hamilton and was summarily rejected by her. The court noted that it had not seen any detailed evidence of such in the record other than a terse reference by the plaintiff. Accordingly, the plaintiff was afforded the opportunity to adduce evidence of the same, but none has been presented.

[3] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[4] Taylor's deposition is also found in the plaintiff's submission at document 15, exhibit A. This exhibit consists of excepts of the deposition. The court will cite to document 12, exhibit A for consistency.

2

employed by the defendants.

Taylor's work performance was first evaluated in August 1996. He received a total score of 246 out of 400 possible points in that evaluation. This was at the upper end of the mid-range of performance. The documentation for the evaluation described his overall rating as "[m]eets standard level of performance." (Doc. 15, Tab 1). As a consequence of the rating, Taylor was given a three percent merit increase in October 1996. (Taylor Depo. at 154-55; Doc. 12, Ex. C (Denise Hamilton Deposition (hereinafter "Hamilton Depo.")), at 91)[5].

While he was a Junior Accountant in 1996, Taylor was assigned a project involving additional work in the Strategic Business Unit for the Division of Women's Services for approximately eight months. (Taylor Depo. at 179). Bobbie Burkhart, the Director of Finance, told him that if he performed satisfactorily in the position, she would reclassify him as an Accountant in December. (*Id.*). However, she left the defendants' employment around the end of August 1996. She was replaced by Denise Hamilton, who was appointed as Interim Director.[6] Taylor submitted his paperwork for a promotion to Accountant. (*Id.* at 150). He was told by Higdon that the paperwork for the reclassification had been forwarded to Hamilton. After the promotion did not occur in January 1997, the plaintiff was told by Higdon that "Hamilton denied the promotion on the grounds that it was too much of an increase in [his] salary. Mr. Higdon said Ms. Hamilton proposed to give [him] half of the salary increase retroactive to January and

---

[5] Hamilton's deposition is also found in the plaintiff's submission at document 15, exhibit B. This exhibit consists of excepts of the deposition. The court will cite to document 12, exhibit C for consistency.

[6] Hamilton is now the Director of the Financial Management Department (hereinafter "FMD"). (Hamilton Depo. at 22). The FMD has four sections, each of which is headed by a section chief: Budgeting, headed by Dede Moore; Managed Care, headed by Pam Faust; Reimbursement, headed by Higdon, and Decision Support, headed by Laura Smith Kelly. (*Id.* at 29-30).

3

the other half would be added in June." (Doc. 15, Tab 2).  She was not willing, however, to approve the promotion with full pay at that time.  (Taylor Depo. at 180).  Taylor found this unacceptable.  (Doc. 15, Tab 2).

Taylor was promoted to an Accountant on February 21, 1997, when a position opened in one of the other sections of the Department.  (Taylor Depo. at 155, 180).  Higdon and another supervisor of the affected section, Dede Moore, "swapped out positions" to allow for Taylor's promotion.  (*Id*. at 180).  His salary was increase to around $26,187.00.  (*Id*. at 155).

Soon after the promotion, the UAB Human Resources Department, Compensation Division, recognized that Taylor was being paid less than the minimum authorized for the position.  The Human Resources Department issued an adjustment effective March 1, 1997, to bring him to the minimum amount ($26,936.04).  (Doc. 15, Tab 3).  This increase was a result of Taylor's complaint to the Compensation Division.  (Taylor Depo. at 155-56).  His salary was raised again on October 1, 1997, to bring him to the then minimum amount for the position ($27,955.20).  (Doc. 15, Tab 3).

Taylor received his second annual evaluation in about September 1997.  He received a total score of 295 out of 400 possible points this time.  This placed him in the category that was one level above his last evaluation.  The documentation for the evaluation provides that Taylor "[f]requently exceeds [the] standard level of performance."  (Doc. 15, Tab 5).  Higdon wrote that Taylor's knowledge of "reimbursement" and "PIP accounts" had improved from the previous evaluation, that he put forth a "conscientious effort" and achieved "good results" in preparing the monthly transfer of funds, and that he was "cooperative with staff and management."  (*Id*.).  The only negative comment was that he needed to keep his supervisor better informed regarding his

4

special project work. (*Id.*). Unlike the last evaluation, this one was not signed by a reviewer. Taylor did not receive a merit raise as a result of the evaluation. Hamilton stated that she did not approve a raise for him in October 1997, the beginning of the new fiscal year, because he had received a raise when he was promoted to the Account position. (Hamilton Depo. at 91, 100-01). She felt that giving him another raise would be "unfair to the other employees." (*Id.* at 87, 91-92).[7] Hamilton recognized that the plaintiff was the lowest paid Accountant in the Department. (Hamilton Depo. at 101, 105, 106-07). Taylor also was the most recently appointed Accountant in the Department.[8] (Doc. 15, Tab 7).

Taylor received an equity adjustment in his salary in February 1998. (Taylor Depo. at 146, 157; Doc. 12, Hamilton Depo., Ex. 3). His pay was increased 3.27% to bring him to the minimum for the Accountant position. (Doc. 15, Tab 7). Taylor received another salary adjustment on September 29, 1998, precipitated by the Compensation Office because he was not given credit in February for three years of experience he had outside of the University. (Hamilton Depo., Ex. 3). The adjustment was retroactive to February 1998. (Taylor Depo. at 146-47).

In about January 1998, Taylor missed the monthly close-out performed by his section because he was away from work for three days recovering from dental surgery.[9] (Doc. 15, Tab

---

[7] Hamilton testified that no other employees who were promoted received raises either. (Hamilton Depo. at 107-09). Specifically, she testified that Debbie Jones did not receive a merit increase when she was promoted. (*Id.* at 108). She also stated that the Reimbursement Specialists did not get a raise. (*Id.*). There is no evidence, however, that these people, like Taylor, were making below the minimum.

[8] Marlo Crowder, another African American, had less seniority that Taylor, but she was a Junior Accountant at that time. She was hired shortly after Taylor became an Accountant. (Doc. 15, Tab 7).

[9] The monthly closeout is an important, time sensitive function of the reimbursement section. (Higdon Depo. at 56-60).

19). He states that when he returned to work, he was told by some unspecified individual that he should not have missed the close-out because his situation was not a medical emergency. (*Id.*). A couple of months later, two other "non-black employees were allowed to be off during close-out." (*Id.*). Specifically, Taylor asserts that Zachary White, an Accountant, was allowed to go to Miami to a conference and Jim Reece, a Reimbursement Specialist, was allowed to go to Las Vegas. (*Id.*).

Taylor applied for a Senior Accountant's position that was vacant in around June 1998, about fourteen months after he started working as an accountant, by obtaining an application from Human Resource Management.[10] (Taylor Depo. at 43, 45, 48). He learned about the positions when he overheard Lori Parsons, Denise Hamilton's assistant, talking about the fact that she was accepting resumes for the positions. (*Id.* at 49-50, 160). Because he was working on a project with Carolyn Whitmire, a Senior Accountant, he was also aware that she was leaving; thus creating a Senior Accountant opening. (*Id.* at 50-51). The project he was working on with Whitmire involved a feasibility study to decide what should be done with a convalescent facility. (*Id.* at 50-54). Taylor understood that it was his responsibility to help gather statistical information, to work with a cost accounting system called TSI, and to assist the consultant. He also further understood that he was going to be taking over that work when Whitmire left. (*Id.* at 51-53). When she left, he took over those duties for a short time. (*Id.* at 52).

The minimum qualifications for the Senior Accountant positions included a bachelor's degree in accounting or a business degree with an appropriate accounting concentration and five

---

[10] There were actually two vacancies. One was to be filled immediately and the other was filled later. (Taylor Depo. at 95).

years accounting experience. (Taylor Depo. at 142, & Ex. 15, p. 2). Taylor did not have a

bachelor's degree in accounting. His degree was in management, which was a part of the School

of Business. Although he had courses in accounting, he did not have a concentration in

accounting. (*Id.* at 142-44). There was also a dispute between Taylor and Hamilton concerning

the amount of accounting experience he had. (*Id.* at 144-45).

Taylor expressed his interest in the Senior Accountant positions by sending a

memorandum to Higdon on June 15, 1998. (Taylor Depo. at 46 & Ex. 4; Doc. 15, Ex. 9). He

sent the memo because he felt that he had been "snubbed by Ms. Hamilton, and she always

disregarded [him]." (*Id.* at 48). According to Taylor, "[s]he had been mean, humiliated [him],

degraded [him], and treated [him] as a bad person." (*Id.*). He "figured this would be [his] only

opportunity to get a fair and reasonable opportunity to be considered for the position." (*Id.*). He

also states that he previously "had been judged by the color of [his] skin and not the contents of

[his] character." (*Id.* at 65). The memo provided:

> This correspondence is to express my interest in the Senior Accountant's vacancy
> that exists in the department of Financial Management.
>
> During my tenure at UAB, I have consistently and successfully performed the
> duties of my current position. I am confident I can handle the various intricacies
> of the Senior Accountant's position. I also believe Denise Hamilton, Director of
> Finance, has total and complete confidence in my accounting abilities; in that, she
> has expanded the scope of my current position by assigning me job tasks currently
> performed by the department's two Senior Accountants, Leigh Blackburn and
> Carolyn Whitmire.
>
> I respectfully request a reclassification of my current position. In addition, last
> week I applied for the senior accounting position which is currently vacant in the
> department.

(Doc. 15, Ex. 9). The memo was sent to various supervisors in the Financial Management

Department ("FMD"), including Hamilton's supervisor. After Taylor sent the memo, his duties

7

on the project he was working were taken away. (Taylor Depo. at 57). He only worked on the

project for a couple of weeks. (*Id*. at 58). He was also working with the defendant's TSI

computer system. (*Id*. at 59-60). However, his passwords and access to the system were taken

away. (*Id*. at 64). About that same time, access to the TSI system was limited by the defendants

to only people who worked in the TSI division, which did not include the plaintiff. (*Id*. at 63).

Taylor also states that after he sent the memo, Hamilton screamed at him and threatened

him: "She called [him] into her office and pointed her finger and rant[ed] and raved and treated

[him] badly and told [him] that if [he] had not sent the memo out, that [he] had better not send it

out unless [he] wanted to be in trouble." (Taylor Depo. at 66, 69-70, 75-76). She also told him

that she would "never consider [him] for the job in the first place." (*Id*. at 71). Later that same

day, Hamilton went to Taylor's office and again yelled at him, causing other people who were in

the office to walk out. (*Id*. at 69-70).

Taylor also talked with Richard Telkamp, the Chief Financial Officer for University

Hospital (Hamilton's supervisor), after he sent the memo.[11] He told Telkamp that Hamilton was

discriminating against him. (Taylor Depo. at 105). He also talked with Barbara White, the

Director of Hospital Human Resource Management. (*Id*. at 106). He told her that he felt he was

being treated unfairly and that he had been given unfair evaluations. (*Id*.). White told him that

he "should consider looking for other positions in other departments." (*Id*. at 107). Taylor also

told Higdon that he was being mistreated by Hamilton in that she was discriminating against him

---

[11] No specific date for the conversation is articulated. (Taylor Depo. at 105).

because of his race. (*Id.* at 108). However, Higdon "totally disregarded" Taylor.[12] (*Id.*). Higdon

did suggest that he look for another position and that he (Higdon) would help him. (*Id.*).

> Hamilton responded to Taylor's memo with her own. It states:

> As we discussed, the responsibilities that you will be assuming in the next couple
> of months will not be of the Senior Accountant level. The work responsibilities in
> your area have decreased because of the timing of the year; therefore, you have
> extra time.

> Since we will be having three vacancies all of us will be carrying extra loads,
> including Zachary White, Laura Smith, Jennifer Cleveland, and myself. I also
> anticipate that the accountants in the budget area will crossover some when the
> budget season slacks off.

> At this time, I see no need to reclassify your position.

(Taylor Depo. at 121-23 & Ex. 7).

During the summer of 1998, Taylor began talking with Anita Clemon, a Senior Human

Resource Management Relations Representative in the Department of Human Resource

Management, concerning his situation with Hamilton. (Taylor Depo. at 121). On July 27, 1998,

he sent Clemon a memorandum. It provides:

> This memorandum is a follow-up on our previous conversation. I have
> thoroughly considered your suggestion pertaining to meeting with my director,
> Ms. Denise Hamilton in an attempt to resolve my current situation.

> It is my position that Ms. Denise Hamilton acting under Alabama law caused
> and/or effected the deprivation of my protected entitlements, and such deprivation
> occurred by willful, deliberate, arbitrary, capricious, malicious, and otherwise
> intentional conduct, which exceeded her authority under Alabama law in
> depriving me of the aforesaid entitlements.

> Although I have decided to file a formal grievance against Ms. Denise Hamilton,

---

[12] Taylor states that he complained to Higdon about Hamilton discriminating against him in about 1997. (Taylor Depo. at 108). Taylor did not provide any specifics other than to state that Hamilton treated him in a hostile and unprofessional manner. (*Id.* at 107-08). This is the matter the court allowed the plaintiff to supplement the record concerning after the hearing. (See footnote 2 herein).

in an attempt to continue to be a team player I will defer the filing of my grievance in order to allow you an opportunity to mediate my current situation.

Once again, your assistance is sincerely appreciated.

(Taylor Depo. at 120 & Ex. 6). He sent a copy of this memorandum to Hamilton.

Hamilton told Taylor that she was not going to consider him for the Senior Account position because he "lacked initiative, [he] was irresponsible, and [he] didn't do any of the things that [he] was supposed to do." (Taylor Depo. at 135-36). Hamilton told Connie Pruitt, a Human Resources professional that was inquiring into the matter on August 3, 1998, that "he did not have the skills necessary to do the job." (Doc. 15, Tab 12). Hamilton was told by Pruitt that Taylor appeared to meet the minimum requirements. She agreed, but stated that he lacked the personal and analytical skills necessary. *(Id.)*. Hamilton was also told that if his performance was "problematic," she should have more accurately assessed his situation. *(Id.)*. Hamilton told Pruitt that she understood and that she would start documenting things. *(Id.)*. However, after prodding by the Human Relations Department, Hamilton agreed to offer him an interview. (Taylor Depo. at 135). On August 4, 1998, Hamilton sent Taylor an e-mail asking him to set up an interview with her assistant, Lori Parsons. (Taylor Depo. at Ex. 14). Taylor accepted the offer of an interview by sending Hamilton a memo on August 4, 1998. *(Id.* at 135, & Ex. 13). He also sent her an e-mail on August 5, 1998, that stated:

> I may have been insistent on Monday (August 03, 1998 at approximately 10:45 a.m.) about not accepting an interview with you and Laura Smith, but that was only because you told me you were offering me an interview because that was what human relations told you to do. You told me that your were not offering me an interview because you thought it was right or that I deserved one, or that your had any intentions to offer me the position but you were doing it only because you were being forced to by human relations. You told me you felt I should accept the interview because I had no basis to grieve and the process would only created problems for you and me. Those comments really discouraged me and made me

10

> feel hopeless about the whole situation.  However, after having time to reflect on the situation, I felt I should go ahead and interview for the position to let you know that I really do appreciate the invitation to interview.

(Taylor Depo. at Ex. 14).

> The next day, Hamilton sent an e-mail to Taylor.  It provided:

> You are not recalling the conversation correctly.  I asked you if you would like to interview for the position and you said no.  Then you asked me why I was giving you an interview.  I said that your qualifications have not changed, but I was willing to hear from you (even though you could have come down here and talked with me without a formal interview).  HR felt that if I explained the details of the job requirements with you, you would realize yourself that you aren't qualified.

(Taylor Depo. at 137 & Ex. 14).  Taylor subsequently interviewed for the positions.  (Hamilton Depo. at 148-49).  Taylor did not receive either Senior Accountant position.  The positions went to Gary Harden and Susan Merritt.  Hamilton "[t]old him that it would be irresponsible for [her] to hire [and] train a person in a specialized position when [she] knew that he is using [it] as a stepping stone."  (Doc. 15, Tab 14).  Hamilton's notes from Taylor's interview state that he "snapped at [her]."  (*Id.*).  Harden had almost eighteen years accounting experience; Merritt had twenty-four years experience.  (Doc. 12, Ex. G, Bates No. UAB01054, 01171).  Harden and Merritt also have undergraduate degrees in accounting.  (*Id.*).  Merritt also has a Masters of Business Administration degree.[13]  (*Id.* at 01172).

About this time, Hamilton began reviewing Taylor's original application that was submitted to UAB and his resume.  (Hamilton Depo. at 226).  She noticed some discrepancies.  She presented them to Connie Pruett in Human Resources.  Pruett informed her that they did not warrant discipline.  (Hamilton Depo. at 231 & Ex. 15).  Taylor was the only employee whose

---

[13] The plaintiff is not asserting that these individuals were less qualified.

11

application and resume were reviewed in this manner. (*Id*. at 233).

Taylor filed his grievance with Clemon on September 1, 1998. (Taylor Depo. at 108-09; Ex. 9[14]). He complained to Clemon that he had been discriminated against based on his race for some time and that he had been denied the promotion. (*Id*. at 109, 114-18). Clemon suggested that he write up the grievance complaining that he did not get the promotion because of his race. (*Id*. at 109, 114-16, 124-26, 128-29). He prepared it that way; then, after reconsidering, he amended it to add additional complaints about race discrimination. (*Id*. at 129-30). He states that the Grievance Committee never addressed the discrimination issue. (*Id*. at 109-11). He did prepare additional written documents for submission with his grievance that were presented to the committee. (*Id*. at 111-12, 133; Ex. 11 & 12). Thereafter, Taylor asked to speak with Susan McWilliams, the Vice-President of Human Relations. He met with her and Clemon. He was told by McWilliams "that [he] needed to learn how to shut [his] mouth and do what [he] was told. If [he] had a problem with it, then [he] should go find [ ] a job elsewhere." (*Id*. at 113-14).

The Grievance Committee found against Taylor regarding his failure to promote claim. (Doc. 12, Ex. D (Anita Clemon Affidavit) ¶ 10). The findings of the committee were upheld by McWilliams. (*Id*. at ¶ 11). Taylor's appeal to the President of the University resulted in the committee's decision being upheld. (*Id*. at pp 13).

Taylor received his third annual evaluation on August 28, 1998. (Doc. 15, Tab 8). Higdon told Taylor that he was "urged" by Hamilton to give Taylor "a bad evaluation and to try to force me to quit. He (Higdon) stated that, although he disagreed with her, the boss was the

---

[14] There is also a typed version of the grievance found at exhibit 10. (Taylor Depo. at 130 & Ex. 10 and Doc. 15, Tab 10).

boss, right or wrong." (Doc. 15, Tab 21). According to Hamilton, she told Higdon that Taylor's evaluation needed to be appropriate for the categories listed on the form and that it needed to be realistic. (Hamilton Depo. at 253). Taylor received a total score of 95 out of 400 possible points. This placed him in the next to the last evaluation category, which provides that the person "[o]ccasionally meets [the] standard level of performance." (Doc. 15, Tab 8). The overall evaluation was negative.[15] (*Id*.). Taylor refused to sign the evaluation. He did not receive a merit increase in fiscal year 1999. (Hamilton Depo. at 95-97). Hamilton was relying on Higdon's evaluation of Taylor in not awarding him an increase. (*Id*. at 97-98). During this rating period, Higdon had some difficulties with Taylor's performance. Specifically, Taylor was dilatory in delivering the monthly closeout reports that were necessary for the other division employees to accomplish their work in a timely fashion in a very time sensitive area. (Higdon Depo. at 85, 101-02). Taylor also incorrectly transferred several hundred thousand dollars to the Alabama Medicaid agency. (*Id*. at 90-91). Higdon stated that during this time, Taylor was very defensive, making it difficult to help him with his performance deficiencies. (*Id*. at 104-07).

Taylor filed his discrimination charge with the Equal Employment Opportunity Commission on January 15, 1999. (Doc. 1 at ¶ 7). He received his right to sue letter on September 10, 1999. This action was filed on December 8, 1999. (*Id*. at 1).

Taylor received his fourth evaluation in December 1999. He scored 146 out of 400, which placed him at the bottom of the "meets standard level of performance." (Hamilton Depo. at 110-11; Higdon Depo at Ex. 7). Taylor sent Higdon a memo regarding the evaluation. He

---

[15] The evaluation stated that Taylor's understanding and performance in the cost accounting area had not improved; his "working knowledge of basic accounting concepts is questionable;" his "lack of experience and training limits the projects that can be assigned to him;" and he is argumentative with other staff. (Doc. 15, Tab 8).

stated: . .

> I continue to be disappointed in the scores I receive on my annual evaluations; however, I am not surprised because on last year you told me that you would continue to increase my evaluations each year if I continued to perform at the same level I had always performed at.
>
> During our meeting to discuss this years' evaluation, you expressed to me numerous times that this was the most you could give me this year. You went on to say you would incrementally increase my scores on an annual basis.
>
> Aside from the issue above, you continue to make very flattering statements about my performance, but the scores I received in each category doesn't (sic) coincide with those comments.
>
> I hope that at some point in the future that I will receive an honest assessment of my performance and not an evaluation that attempts to cover-up past misdeeds on management's part.

(Higdon Depo. at Ex. 9). As a result of the evaluation, he received a .75 percent salary increase.

(Taylor Depo. at 157; Hamilton Depo. at 110; Higdon Depo. at Ex. 7). According to Hamilton,

Taylor was the only person who did not consistently meet the "exceeds the standard level of

performance." (Hamilton Depo. at 111). She discussed this with Higdon. (*Id*. at 112). They

recommended that Taylor take some accounting classes, including classes at UAB at no cost to

Taylor.[16] (*Id*.).

In the Spring 2000, Taylor was on a downtown street running a personal errand, going to

his credit union, when he saw Hamilton approaching. She came up to him and started yelling at

him, asking what he was doing and stating that he was to supposed to be at work. (Taylor Depo.

at 78-79). She also told him that he was not to take such breaks during the day. (*Id*. at 79).

Taylor replied that it was customary. (*Id*.). She said it was not. (*Id*.). After Taylor returned to

_____

[16] This was a recommendation for Taylor they discussed for at least three years. (Hamilton Depo. at 112-13).

14

work, Hamilton sent a memo out to all the employees regarding running errands. It provided:

> It has come to my attention that I need to clarify in writing what my work expectations are of this office. It has long been my view that we are professionals and my expectations are that you work like that.

> Just a few clarifications. Errands as a general rule need to be run during your lunch break. If the errand cannot fit within that time frame, the time can be comped by coming in early, working late, or working through lunch. Your supervisor needs to know of your plans. I expect each of us to put in 8 hour days at a minimum. There are times that more hours are needed to meet deadlines. And as professionals, I don't have a huge problem taking longer lunches on one day and working through lunch on another.

> If you have any questions or comments, please let me know.

(Taylor Depo. at Ex. 5). Taylor states that before and after the memo, white accountants were and are allowed to go out and run errands outside their lunch hour. (*Id.* at 80-82, 89, 159). Since that time, Taylor has not run errands outside the lunch hour. (*Id.* at 81). In one instance, when Hamilton noticed that some employees put "CU" for the credit union on the sign out sheet, she "just laughed it off." (*Id.* at 82-83). Taylor stated that if he had done that, he feels that she would not have had the same reaction. (*Id.* at 83). He premises this on what Hamilton told him on the street. (*Id.* at 86). Because he was not comfortable talking to Hamilton, he did not discuss this with her. (*Id.* at 87). Taylor also notes that other employees were not happy with the way he was treated. (*Id.* at 91-93).

Taylor states that Parsons told him on one occasion that he was to report back to her when he returned from lunch. (*Id.* at 159). Other white accountants that he spoke with were not required to report to Parsons when they returned from lunch. (*Id.* at 159). Hamilton states that she was informed of this incident involving Parsons and Taylor; specifically that Taylor was either loud or angry at Parsons. (Hamilton Depo. at 163-64). Hamilton went to his (Taylor's)

office and asked him who he thought he was "raising [his] voice at [her]." (Taylor Depo. at 161-62). Taylor told Hamilton that he did not raise his voice at Parsons. Later that same day, Hamilton called Taylor a "troublemaker." (*Id*. at 162).

Taylor also states that Hamilton regularly complained to him about his work performance. She would "just basically tear into [him] about any least little thing." She would yell at him. She would tell him that he lacked initiative. (Taylor Depo. at 164). This would occur at different intervals at different times; at its height, it was about twice a week. (*Id*. at 163). She would not be specific in her complaints and she did not show him what needed to be done to improve. (*Id*. at 165).

Taylor stated that, at some time, the other accountants went to a conference at the Gulf coast in Perdido, Alabama, but he was left behind. He did not even know about the conference until they had gone; he came back from lunch and everyone else was gone. (Taylor Depo. at 172).

Taylor received an evaluation score of 186 for his 1999-2000 year evaluation. (Higdon Depo., Ex. 8). This is a "[m]eets [the] standard level of performance" rating (*Id*.). He did receive a merit increase in or about September 2000.[17] (Hamilton Depo. at 266). Higdon's evaluation states that Taylor's performance at work had improved. (Higdon Depo. at 109). He was performing at an "average" level, which was an improvement over his past work. (*Id*. at 110, 115, 119). However, Higdon stated that, unlike other employees, Taylor still did not work overtime or on weekends as a rule. (*Id*. at 110-12).

---

[17] Although counsel asserts that the amount of the raise was one-half of one percent, the testimony of Hamilton was that she did not recall the amount of the raise. (Hamilton Depo. at 266). Hamilton's supplemental affidavit states that Taylor received a .5% raise due to his low performance evaluation. (Doc. 22 at Ex. 1-Supp.).

Taylor received an evaluation score of 157 for his 2000-2001 evaluation.  (Hamilton Aff. at ¶ 6).  This is a "[m]eets [the] standard level of performance rating."  He received an increase of .5%.  (Id.).

Taylor received an evaluation score of 234 for his 2001-2002 evaluation.  (Hamilton Aff. at ¶ 6).  This again is the "[m]eets [the] standard level of performance rating."  He received an increase of 2%, as did the other employees who were below the highest performance level.  (Id.).

As a general rule, the managers of each division perform the employee evaluations. (Hamilton Depo. at 39).  Higdon performed the evaluations on Taylor.  (Higdon Depo. at 142). He did not recall discussing the actual score, rating, or ranking of Taylor with Hamilton before doing the evaluations.  (Id. at 144).  He did not recall any of his evaluations ever being changed. (Id. at 142).  Hamilton reviewed the evaluations, including Taylor's, and determined the raises for each employee premised on the amount of money available in the "pool" established by the University.  (Hamilton Depo. at 73).  The "pool" is determined by multiplying the percentage amount authorized by the University times the total salaries for the employees in the Department. (Id. at 77).  The individual raises are premised upon the employee's score on their evaluation, with the higher performers receiving a greater percentage raise.  (Id. at 83).

Taylor also complains that his "supervisor [(Higdon)] constantly told [him] that he was going to get [him] study-at-home courses and all of these other things that would help [him] in the areas (sic) of reimbursement which is where [he] wanted to focus on at the time to learn as much as [he] could. . . ."  (Id. at 139).  However, he was never given the books or the

materials.[18] (*Id.* at 173, 181-83). The defendant notes that Taylor can take accounting courses at UAB at no cost to him. (Hamilton Depo. at 112). Higdon and Hamilton talked with Taylor about his ability to go to school, but Taylor has not availed himself of this opportunity.[19] (*Id.*). The defendant also states that Taylor was sent to a course in Chicago at some unspecified time related to cost reporting. (*Id.* at 114).

Hamilton did not assign Taylor special projects because she did not have one that she felt he could do. (Hamilton Depo. at 128). She premised her assessment of Taylor on Higdon telling her that Taylor "has to be specifically led through an assignment. And he doesn't do very well in initiating the logic that it requires many times on a special project." (*Id.* at 130). These projects are usually assigned to the managers in the department. (*Id.* at 134). Hamilton has not assigned special projects to Jim Reece or Jim Holland who are white Reimbursement Specialists in Taylor's section. (*Id.* at 134).

Taylor states that Higdon took other white members in his section to meetings and out to lunch with clients. (Taylor Depo. at 182). The record reveals, however, that there were no other accountants in Higdon's division. Instead, there were Reimbursement Specialists, who were in more specialized positions rated at a higher level than the accountants. (Higdon Depo. at 42-45). They (the Reimbursement Specialists) also dealt with outside agencies such as Medicare, Medicaid and Blue Cross. (*Id.* at 43, 49).

Higdon noted that one of Taylor's deficiencies was his lack of reimbursement

---

[18] Taylor acknowledges that he got some of the information by visiting the HFMA (an associational) website. (Taylor Depo. at 181-83).

[19] Taylor states that he had already taken the accounting courses that were recommended by Higdon. (Taylor Depo. at 180-81).

knowledge.[20] (*Id.* at 136). He also stated that Taylor had a tendency to "stray" from the office. (Higdon Depo. at 172-73). Higdon described the situation as follows: ". . . when he should be in the office, we might see him out on the street and not know why he was out on the street, what he was doing." (*Id.* at 172). Hamilton talked with Higdon about this situation. (*Id.* 172-76). She was interested in knowing what Taylor was doing and where he was going. Higdon also stated that back in 1997 (three years before the deposition) he would see Taylor "going out circuitous routes and leaving the office through circuitous routes and all sorts of things." (Higdon Depo. at 176-78).

During Higdon's deposition, he was asked what Taylor need to do to improve. He stated that Taylor needed to improve his interpersonal skills, particularly dealing with the acceptance of constructive criticism, he needed to attend HFMA meetings; get his accounting degree; and take some self-study courses in cost reporting and reimbursement. (Higdon Depo. at 233-34). Higdon provided counsel with other job specific items that Taylor could do to improve his overall performance rating. (*Id.* at 236-40).

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden

---

[20] Higdon stated that this information is available in HFMA magazines and articles, on web sites, self-study programs, seminars and workshops. (Higdon Depo. at 132, 138).

to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof.  *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings.  *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the

20

nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment."

21

*Allen*, 121 F.3d at 643.

## IV.    MOTION TO STRIKE PORTIONS OF THE PLAINTIFF'S EVIDENCE

The defendant asks the court to strike certain of the exhibits submitted by the plaintiff in opposition to the motion for summary judgment because they fail to meet the requirements of Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE. Rule 56(e) states, in pertinent part, that affidavits in support of or in opposition to a motion for summary judgment ". . . shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). "If a supporting or opposing affidavit fails to conform to Rule 56(e), the opposing party may move to strike the nonconforming portion [or portions]." *Ali v. City of Clearwater*, 915 F. Supp. 1231, 1236 (M.D. Fla. 1996), *aff'd*, 138 F.3d 956 (11th Cir. 1998), citing *Interfase Marketing, Inc. v. Pioneer Technologies Group, Inc.*, 1993 WL 229601, *2 (M.D. Fla. June 23, 1993) and *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1529 (M.D. Fla. 1989)).

### A.    The Plaintiff's Affidavit

The defendant moves to strike the plaintiff's affidavit in its entirety because it contains information not provided during his deposition when he was asked questions related to the matters stated in the affidavit. At the outset, the court notes that much of the information contained in the affidavit is already a part of the evidence submitted on the summary judgment motion. Although many of the statements in the affidavit are argumentative and conclusory, such as the statements that "the current Department Director [(Hamilton)] has stalled my getting each equity adjustment" and "I have been systematically excluded from meetings," various portions of the remainder of the affidavit appear to contain factual information. The plaintiff's

22

argumentative and conclusory statements are due to be struck.

The defendants also assert that the affidavit contains inadmissible hearsay statements made by Higdon to the plaintiff. Paragraph 5 of the affidavit provides:

> When I received my 1998 performance evaluation from Mr. Higdon, he warned me in advance that it would not be good. He told me that Ms. Hamilton had urged him to give me a bad evaluation and to try to force me to quit. He stated that, although he disagreed with her, the boss was the boss, right or wrong. Mr. Higdon told me that the situation would never improve as long as Ms. Hamilton remained as Director of the Department, and that I should start checking the Internet for another job. He said that he would try to help me get into another Department.

(Doc. 15, Tab 22). The defendants assert that Higdon and the plaintiff were deposed and this information was not provided by the plaintiff's despite the fact that it would have been responsive to questions propounded during the deposition. (Doc. 16, ¶ 1).

In *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir. 1984), the court stated that "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Id.* at 657. In *Junkins*, the plaintiff brought an action against the manufacturer of prefabricated buildings to recover for an alleged fraud and reckless misrepresentations in denying the plaintiff a dealership after he purchased land and a building. During his deposition, the president of the plaintiff company testified three times that there was no condition attached to his purchasing the building. *Id.*, 736 F.2d at 657. On the motion for summary judgment, the president stated in an affidavit that he had a meeting with representatives of the defendant who told him that if he would purchase one of their buildings then he would be awarded the dealership. *Id.* Affirming the trial court's grant of summary judgment for the

23

defendant, the court stated:

> Under these facts as presented, we agree with the district court that the
> affidavit constituted a sham. When a party has given clear answers to
> unambiguous questions which negate the existence of any genuine issue of
> material fact, that party cannot thereafter create such an issue with an affidavit that
> merely contradicts, without explanation, previously given clear testimony.

*Id.*

Based on the information presently before the court, it cannot conclude that the affidavit

is so inconsistent with the testimony of Taylor during the deposition to permit a finding that the

affidavit is a sham. The present situation is not as clear as the one in *Junkins*. In *Tippens v.

Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986), the court stated:

> A definite distinction must be made between discrepancies which create
> transparent shams and discrepancies which create an issue of credibility or go to
> the weight of the evidence. "An opposing party's affidavit should be considered
> although it differs from or varies [from] his evidence as given by deposition or
> another affidavit and the two in conjunction may disclose an issue of credibility."
> 6 Moore's Federal Practice ¶ 56.15[4] (2d ed. 1985) (footnote omitted).

> The purpose of summary judgment is to separate real, genuine issues from
> those which are formal or pretended. To allow every failure of memory or
> variation in a witness's testimony to be disregarded as a sham would require far
> too much from lay witnesses and would deprive the trier of fact of the traditional
> opportunity to determine which point in time and with which words the witness
> (in this case, the affiant) was stating the truth. Variations in a witness's testimony
> and any failure of memory throughout the course of discovery create an issue of
> credibility as to which part of the testimony should be given the greatest weight if
> credited at all. Issues concerning the credibility of witnesses and weight of the
> evidence are questions of fact which require resolution by the trier of fact. An
> affidavit may only be disregarded as a sham "when a party has given clear
> answers to unambiguous questions which negate the existence of any genuine
> issue of material fact . . . [and that party attempts] thereafter [to] create such an
> issue with an affidavit that merely contradicts, without explanation, previously
> given clear testimony." *Van T. Junkins,* at 657.

> [E]very discrepancy contained in an affidavit does not justify a district
> court's refusal to give credence to such evidence. *See Choudhry v. Jenkins*, 559
> F.2d 1085, 1090 (7th Cir.) (summary judgment was improper even though party's

testimony was "not a paradigm of cogency or persuasiveness," since it was not a "transparent sham"), *cert denied sub nom.*, *Indiana v. Choudhry*, 434 U.S. 997, 98 S. Ct. 634, 54 L. Ed. 2d 491 (1977). In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition. *Kennett-Murray, Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980).

The court finds that the motion to strike the affidavit, particularly this portion, is due to be denied. The defendants have failed to meet the standard warranting exclusion of this information.

To the extent that the defendants complain that Higdon does not have sufficient authority to speak as an agent of the defendants, the court disagrees premised on the evidence presently before it for summary judgment purposes. Higdon was and is a manager of the defendant; specifically, he is the Manager of the Reimbursement Section in the Financial Management Department. The court sees no reason to find that he is not an agent for purposes of FEDERAL RULE OF EVIDENCE 801(d)(2).

To the extent that the plaintiff asserts in the affidavit that the Compensation Division mandates that each employee be paid the minimum recommended for that classification, the evidence is due to be stricken. A statement that is not supported by evidence of personal knowledge of specific facts that would demonstrate that the statement would be admissible at trial or to avoid summary judgment should not be considered. *See Givhan v. Electronic Engineers, Inc.*, 4 F. Supp. 2d 1331, 1335 (M.D. Ala. 1998) (Statement in affidavit which fails to show factual basis for personal knowledge of the matter does not meet the requirements of Rule 56(e)); *see also Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1048 n.6 (5th Cir. 1996) ("This vague and conclusory statement – which includes no reference to racial remarks – fails to 'designate specific facts' – such as what was said, to whom it was said, or even who made the

comments – sufficient to avoid summary judgment."). The plaintiff's assertions concerning the procedures in the Compensation Division are not supported by assertions showing sufficient first-hand knowledge of such matters and therefore should be stricken.[21]

### B. Other Exhibits

The defendant also seeks to exclude the plaintiff's notes (see doc. 15, tab 2, 4, 13, 19, 20) that appear to be a running chronology of events over a number of years. Although these notes were submitted to the Grievance Committee and are a part of the defendant's records, the court finds that they are inadmissible at this juncture other than to the extent they are offered in support of his contention that they show he was pursuing his claim before the Grievance Committee in a good faith belief that he was being discriminated against.[22] Exhibit 21 is not the notes of the plaintiff, but notes by Hamilton concerning her review of his resume and application. (Hamilton Depo. at 226-27). Accordingly, they are not due to be struck for the reasons asserted by the defendants.

### V. DISCUSSION

#### A. Generally: *McDonnell Douglas* Analysis

The Supreme Court's disparate treatment cases, such as *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), provide the appropriate starting point for evaluating the plaintiff's Title VII claims. The

---

[21] The court does note that the record demonstrates that at least two of the plaintiff's increases were a consequence of actions by the Compensation Division after it was determined that he was making less than the amount specified for the job of Accountant.

[22] The court, once again, does note that the record demonstrates that the defendant does not appear to be asserting that the plaintiff advanced his claims in bad faith. To the contrary, they appear to concede, least for purposes of this motion, that the plaintiff subjectively believed he was being discriminated against. (See Doc. 13 at 29-33).

*McDonnell Douglas* scheme for the allocation of burdens and the order of presentation of proof also applies in employment cases under 42 U.S.C. § 1981. *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1060 (11ᵗʰ Cir. 1994). Under the applicable standard in a case like this, where the claims are premised upon circumstantial evidence of discrimination, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253-54 & n.6; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11ᵗʰ Cir. 1997), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998). Once the plaintiff establishes a prima facie case, a legal presumption of unlawful discrimination arises and the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254; *Combs*, 106 F.3d at 1528. "To satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254-55).

Once the employer meets its burden of production, "[t]he presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture," *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993); *see also Burdine*, 450 U.S. at 255 & n.10, leaving the elements of the prima facie case. *Combs*, 106 F.3d at 1528. When those elements are accompanied by evidence of pretext or disbelief of the defendant's proffered explanation, they may permit, in some instances, a finding for the plaintiff. *Id*. at 1529; *see also Hicks*, 509 U.S. at 511, *Evans*, 131 F.3d at 963. The plaintiff, however, always retains the ultimate burden of proving that he was the victim of

27

intentional discrimination. *Hicks*, 509 U.S. at 508; *Burdine*, 450 U.S. at 253.

The court's task in deciding the defendant's motion for summary judgment is limited. The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct. . . . The district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538 (citations omitted).

### B. Application of *McDonnell Douglas*

#### 1.      Disparate Treatment

The plaintiff's first general claim is premised on a disparate treatment theory. Specifically, he alleges he was discriminated against in that (1) he was "chastised by Hamilton for being absent during one monthly close-out due to dental surgery (even though his supervisor had given him permission to be off), but that she said nothing to two white accountants who were absent during subsequent close-outs" (doc. 15 at 19); (2) he was accosted by Hamilton when she saw him in the street when he was going to his credit union, while other white employees were allowed to run errands outside the lunch hour (*id.* at 19-20); (3) he was not invited to lunch meetings or gatherings with outside accountants and government entities while other employees in the section were invited and attended (*id.* at 20); and, (4) he was not paid in an amount consistent with that paid to the other accountants (*id.* at 21).

Title VII makes it unlawful for an employer "to discriminate against any individual with

28

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. § 2000e(a)(1). "Under *McDonnell Douglas*, [the] plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). In order to make a prima facie showing on the disparate pay claim, the plaintiff must demonstrate that (1) he belongs to a racial minority and (2) he was paid less than non-minority employees performing substantially similar work. *See Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 598 (11th Cir.), *cert. denied*, 513 U.S. 919, 115 S. Ct. 298, 130 L. Ed. 2d 212 (1994). The "similarity" requirement for the plaintiff is relaxed in Title VII cases and the defendant's burden in rebutting the prima facie case is "exceedingly light." *Mulhall*, 19 F.3d at 598.

It is evident that the plaintiff meets the first criteria since he is African-American. The parties dispute whether he meets the remaining criteria to establish a *prima facie* case. The second criteria, that Taylor must have been subjected to some adverse job action, is not satisfied by any of the plaintiff's his first three claims as a matter of law.

"Changes in duties or working conditions that cause no materially significant disadvantage, . . . , are insufficient to establish the adverse conduct required to make a prima facie case." *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994). The Eleventh Circuit Court of Appeals has recently stated that

> . . . it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact

29

cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. . . .

*Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239-40 (11th Cir. 2001) (emphasis in original).

In the present case, the plaintiff has not shown an adverse employment action premised on his first three assertions. The fact that he was "chastised" for being absent during one close-out, while others were not is insufficient.[23] There is no evidence that Taylor was written up or otherwise disciplined for this event.[24] Additionally, the fact that Hamilton "accosted" him when she saw him on the street is also insufficient. Again, there is no evidence that Taylor was written up or otherwise disciplined for this event. Although Hamilton prepared and circulated a memorandum about attendance at work as a result of the incident, this does not constitute an adverse job action. His complaint that he was not invited to lunch meetings or other gatherings is also insufficient under the circumstances. This does not constitute "a *serious and material* change in the terms, conditions, or privileges of employment" sufficient to state a claim. *Davis*, 245 F.3d at 1239-40. To the extent that he received disparate treatment in pay, the court finds that, if adequately demonstrated, that would be sufficient to state a prima facie case and, therefore, warrants further consideration and discussion.

With regard to his claim that he did not receive appropriate merit increases while other

---

[23] The first three claims are relevant, however, on his hostile environment claim.

[24] It was not even referenced in his evaluation for the relevant period. *See* Doc. 15, Ex. 8.

employees did, the court must examine each year.  In 1997, he did not receive any merit increase.  The defendants assert that the plaintiff did not get a merit increase that year because he received a raise when he was promoted.[25]  (Hamilton Depo. at 104-05 & Ex. 4).  They support this by offering the testimony of Hamilton that Debbie Jones, an Office Associate, and the Reimbursement Specialists did not receive merit increases the years that were given equity adjustments due to their promotions.  (Hamilton Depo. at 107-08).  Taylor has offered no specific evidence disputing these facts.[26]  He merely states that African-American employees (Taylor and Crowder) "were paid substantially less than all the white employees and that they consistently had to receive pay equity adjustments to bring their salaries up to the bare minimum for employees in their job classifications."  (Doc. 24, p. 1).

The court does not find this to be sufficient under *Combs*.  The defendants assert that, in making this statement, the plaintiff has ignored various factors contributing to the pay differential, including that during much of the relevant period, Taylor and Crowder were the newest employees in the department and would thus understandably make less money than the other accountants.  There is no evidence showing Crowder's past work experience as compared to the other accountants and the record is devoid of the information necessary to adequately compare the plaintiff's experience with the other accountants.  Additionally, the ratings of all the employees impact the amount of the raises; yet the court has not been presented with the ratings for the various employees, including Crowder, in this or many of the other years in issue.  Under

---

[25] The plaintiff did receive a 17.65% salary increase on February 21, 1997, when he was promoted.  (Hamilton Depo. at Ex.4).

[26] The court also notes that the supplemental affidavit submitted by Hamilton following the arguments on the motions shows that "four Caucasian employees who had received equity increases earlier [in fiscal year 2002-2002] received no merit raises at all [that year]."  (Doc. 22, Hamilton Aff., at ¶ 8).

31

the circumstances, the plaintiff's arguments and evidence are not sufficient to overcome the motion for summary judgment as to 1997.

Concerning Taylor's failure to receive a merit increase in 1998 (for fiscal year 1999), Hamilton asserts that it was due to his low evaluation score. (Hamilton Depo. at 97). Taylor has not offered any evidence that tends to dispute this fact. To the contrary, the record shows that his score was in the range that provided that his work "[o]ccasionally meets [the] standard level of performance" expected. (Higdon Depo. at Ex. 6). Nothing in the record challenges the fact that during this rating period, Higdon noted Taylor's deficiencies that were discussed above, including the matters concerning the monthly close-out, his actions in misdirecting certain funds and his difficulties in accepting constructive criticism.[27] To the extent that Taylor asserts that Hamilton told Higdon told him to give Taylor a bad evaluation and force him to leave, the court finds this to be insufficient due to his performance deficiencies during that rating period. Taylor has failed to sufficiently challenge the accuracy of his poor evaluation by Higdon. He has not disputed his misdirection of funds to Medicaid or his failing to accept constructive criticism. Taylor's assertion that he was treated differently because two other employees were allowed to miss a close-out during this same period is not sufficient where there is no evidence his going to the dentist during the closeout was used against him in the August 28, 1998 evaluation.[28] Additionally, there is nothing in the record showing that the other absences (by the other accountants) were not preapproved or requested by the defendants.

---

[27] The court also notes that the employment summary for the plaintiff (Hamilton Depo. Ex. 4) shows that he received a 11.80 % equity salary increase effective February 1, 1998. This was due to his being paid less than the minimum authorized for an Accountant position. (*Id.*).

[28] The only reference in the evaluation to "closeout day" is the fact that he "[c]ontinues to take lengthy lunches on closeout day after requests to not do this." (Doc. 15, Tab 8).

Taylor asserts that the defendants' disparate treatment concerning him is evidenced in, among other things, the small pay increases he received in 1999 and 2000 of .75% and .5%, respectively. (Doc. 15, Brief at 22). In his reply letter (doc. 24) he states that he did not receive any merit increase in 1999 (for fiscal year 2000). He claims these pay increases (or lack of any increase) are inconsistent with the amounts given to other white employees. Specifically, he asserts that "[b]etween 1997 and 2000, Hamilton had awarded merit increases to the other employees in the Financial Management Department ranging from two (2%) percent (sic) (*Id.*) to seven (7%) percent (sic) (Exh. 7). During Hamilton's entire tenure as Director of the Department, she has never given anyone else such a minuscule merit raise."[29] (Doc. 15, Brief at 9). A close review of the record demonstrates that this assertion is flawed. First, exhibit seven is for the single year of 1998. Although it is true that for that year, the raises (merit and equity) were all between three and seven percent for all employees and between 5.18% and 7% for the white employees, there is nothing in the record showing the evaluation scores of the other employees (particularly the accountants) so that the exhibit has any significant meaning for that year, much less the years before or after that.[30]

---

[29] Exhibit 7 is found at document 15, exhibit 7 or attached to the Hamilton deposition at exhibit 5.

[30] The other African-American accountant (Crowder) received increases (minimum and merit) totaling 6.24% in 1999. (Hamilton Depo. Ex. 5). The court makes this notation only because the plaintiff states the following in his reply letter after the hearing on the motions (doc. 24) :

> Although the enclosed are not a complete set of charts showing the merit increases for employees in the Financial Management Department for each year that Mr. Taylor worked under Denise Hamilton, they do reflect that both Mr. Taylor and Ms. Crowder, the only two Black employees in the entire Department, were paid substantially less than all the white employees and that they consistently had to receive pay equity adjustments to bring their salaries up to the bare minimum for employees in their job classification. In addition, the charts reveal that, even when Mr. Taylor or Ms. Crowder did receive a raise based on merit, it was significantly lower than merit raises given to their white cohorts. In 1999, for example, Ms. Crowder received a 3.00% merit increase, about half of what the white employees in the Department were given.

(Doc. 24 at 1).

With regard to the raises in the 2000-01 fiscal year, there is nothing in the original exhibits to suggest, much less demonstrate any disparate treatment of the plaintiff. Hamilton testified in her deposition that, in 2000, the increases for the "top group" were three percent,[31] while the "mid-group" were awarded two percent.[32] (Hamilton Depo at 265-66). She did not recall the amount paid to the "low group," including the plaintiff.[33] (*Id.*). There is no evidence concerning the amount paid the various employees in 1999.[34]

Under the circumstances, the court finds that the plaintiff has failed to meet his prima facie case on his disparate treatment claims. Even presuming that the plaintiff had been able to make the satisfactory showing, he has not sufficiently challenged the defendants' proffered reasons for the pay he received in each challenged year. Summary judgment is due to be granted the defendants on this claim.

### 2.     Hostile Environment

The plaintiff next asserts that he was subjected to a hostile work environment. In order to establish a hostile environment claim, he must demonstrate (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on his race; (4) that the harassment was sufficiently severe or pervasive to alter the

---

[31] In her supplemental affidavit, Hamilton states that "the employees in my department who received performance evaluation ratings in the range of 350-400 were given a 3.18% raise. These [seven] employees were . . . all Caucasian. (Doc. 22, Ex. 1-Supp.).

[32] In her supplemental affidavit, Hamilton states that "the employees . . . who received performance evaluation ratings in the range of 300-350 were given a 2% raise." (Doc. 22, Ex. 1-Supp.). There were seven people in this group; one of whom is African-American. (*Id.*).

[33] In her supplemental affidavit, Hamilton stated that one employee, a white male, received an evaluation of between 200-300 and was given a 1.0% raise. (Doc. 22, Ex. 1-Supp.). The plaintiff, who was the only employee to score less than 200 (157), received a .5% raise. (*Id.*).

[34] Included in the record is the 1999 Account Summary Report for the FMD showing the budget. However, it does not show the amounts of any salary increases for the individual employees. (Hamilton Depo. at Ex. 18 (Hamilton)).

terms and conditions of her employment and create a discriminatory abusive working environment; and (5) a basis for holding the employer liable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc) (citing *Henson v. Dundee*, 682 F.2d 897, 903-905 (11th Cir. 1982), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000). Establishing the fourth factor includes a subjective and an objective component. *Mendoza* 195 F.3d at 1246 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). The employee must "subjectively perceive" the harassing conduct as "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment," and this perception must be objectively reasonable. *Id.* The employee's working environment must be such that, considering all the circumstances, a reasonable person in the employee's position would consider it hostile and abusive, and the employee must subjectively believe it to be abusive as well. *Mendoza*, 195 F. 3d at 1246 (citing *Harris*, 510 U.S. at 21-22 and *Oncale v. Sundowner*, 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201, 208 (1998)).

The defendants assert that the plaintiff has failed to show that the treatment he was subjected to satisfies the objective component of the fourth element. They further assert that the plaintiff cannot show that Hamilton's conduct toward him was because of his race since she "yelled" at Parsons and other employees.[35]  (Doc. 13 at 32).

The court finds that the plaintiff does not meet the fourth element of the prima facie case because the complained-of-actions are not sufficiently severe or pervasive to create an abusive

---

[35] The evidence shows that Parsons was also verbally accosted by Hamilton.  (Doc. 12, Ex. F, ¶ 11).  She also observed Hamilton yelling at other employees as well.  (*Id.*).  The court does not find these facts alone to be sufficient to support the motion for summary judgment on the basis that the conduct against the plaintiff was not race based.

working environment.  The Eleventh Circuit has stated that "[t]he objective component of the severe and pervasive element prevents the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [ ] jokes, and occasional teasing from falling under Title VII's broad protections."  *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) (quoting *Faragher*, 524 U.S. at 778), *cert. denied*, 531 U.S. 1076, 121 S. Ct. 772, 148 L. Ed. 2d 671 (2001).  The statements and conduct complained of must be examined collectively to determine whether they meet the objective threshold for sufficiently severe or pervasive conduct which would satisfy the fourth *Mendoza* factor.  *Gupta*, 212 F.3d at 583; *see also Mendoza*, 195 F.3d at 1246.  In determining the objective component in this analysis, the Supreme Court requires that this court consider four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  *Harris*, 510 U.S. at 23; *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278-79 (11th Cir. 2002), *citing Allen v. Tyson Foods,* 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris,* 510 U.S. at 23, 114 S. Ct. at 371); *Mendoza*, 195 F.3d at 1246 (citing *Allen*, 121 F.3d at 647).  The conduct should be considered in view of the totality of the circumstances, not in terms of isolated incidents, to determine "whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the employee's employment and create a hostile or abusive working environment."  *Mendoza*, 195 F.3d at 1246.

In *Miller*, the conduct was frequent in that the "name-calling permeated the Dothan facility – he hurled the ethnic slurs at Miller three to four times a day" and "Miller's duties required him to go into the service area and interact with Galpin [(the Shop foreman)] on a daily

36

basis, which means he was unavoidably exposed to the harassing comments throughout the approximately one month period;" it was sufficiently severe in that "Galpin and other technicians in the Service Department used the derogatory names in an intimidating manner, shouting them at Miller during the course of berating him for his job performance, or when they were 'arguing with him,' were 'mad with him,' or were 'taunting him;'" it was humiliating and degrading to Miller in that "[t]he very nature of the coworkers' utterances, coupled with the fact that they were directed at Miller and were sometimes used in the course of reprimanding him in front of others;" and "Galpin's behavior prevented Miller from performing his job, on at least one occasion." *Miller*, 277 F.3d at 1276-77.

The behavior challenged here, when viewed in a light most favorable to the plaintiff, is insufficient to satisfy the *Harris* factors. Hamilton's conduct, while certainly not acceptable, does not rise to the level necessary to state a prima facie case. The conduct in this case was not sufficiently frequent or severe to overcome the motion for summary judgment. Although Taylor subjectively perceived the conduct as being sufficient to alter the terms and conditions of his employment, the court cannot find that a reasonable person in the plaintiff's circumstances could find that it was sufficiently hostile and abusive. The frequency of the conduct in this case is in no way similar to the frequency in *Miller*. It is also not sufficiently severe. Although offensive at times, the court does not find Hamilton's actions physically threatening or sufficiently humiliating such as the comments were in *Miller*. Finally, the court does not find that the evidence is sufficient to show that Hamilton's conduct unreasonably interfered with Taylor's performance of his job. This is particularly true where Higdon was supervising Taylor in his daily activities.

37

### 3. Retaliation

Last, the plaintiff asserts that he was retaliated against for filing a grievance alleging discrimination. He asserts that "[t]he chief adverse action taken in retaliation for [his] grievance was [the] defendant's 1998 evaluation of [him] which plunged him from a rating category where he 'frequently exceed[ed]' the standard level of performance to a category where he was barely employable." (Doc. 15 at 25). Taylor further asserts that a "collateral adverse action" that Hamilton initiated was "her campaign to ferret out discrepancies and inconsistencies in Taylor's original resume and UAB application form." (*Id*. at 27-28).

In order to establish a prima facie case of retaliation, the plaintiff must show that (1) he engaged in a statutorily protected activity; (2) the defendant took an adverse employment action against him; and (3) that there is a causal connection between the protected activity and the adverse action. *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998). "The third prong is satisfied if the evidence shows that the protected activity and the adverse action are not totally unrelated." *Id*.

The defendants assert that Taylor does not satisfy the first element because he cannot demonstrate that Hamilton was aware of his protected activity. (Doc. 13 at 27). In support of this assertion, they cite to *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997). The defendants next assert that Taylor cannot satisfy the second element because he has not been subjected to an adverse employment action. Lastly, the defendants assert he has not and cannot show the requisite causal connection.

Regarding the defendants' initial assertion that the plaintiff has failed to establish the first element because Hamilton was not aware of his protected activity, the court finds this argument

38

is related to the third element requiring a causal connection. *See Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999). The pertinent inquiry is whether the decision maker was aware of the protected activity. *Clover*, 176 F. 3d at 1354-55.

There is no question that Taylor engaged in a statutorily protected activity when he filed his amendment to the grievance, which included his lengthy chronology. (Doc. 15, Tab 19).[36] Therein, he specifically asserted that he was being "treated unfairly because of [his] race and or sex." (*Id*.). Although Taylor asserts in his brief that "there is ample evidence that Hamilton was aware of Taylor's grievance long before it was formally filed (doc. 15 at 26) the court finds otherwise. The record does not show, as suggested by the plaintiff, that Hamilton had any knowledge that the plaintiff was complaining about race or sex discrimination at any time earlier than September 1998. To the contrary, the record shows that there is no evidence of Hamilton's knowledge of the plaintiff's Title VII claims until September. In his July 27, 1998, memorandum to Clemon, a copy of which was sent to Hamilton, the plaintiff stated that Hamilton was exceeding her authority under Alabama law in depriving him of a senior accountant's position. (Doc. 15 at Tab 18). Nowhere therein does he mention race or gender discrimination or racial or sexual harassment. His September 1, 1998 grievance merely complains that he was working in a hostile environment and that he was being harassed, it does not state that it was premised upon his race or gender. (Doc. 15 at Tab 10). It was not until his September 22, 1998 amendment that he specifically referenced that he had "been treated unfairly because of [his] race and or sex." (Taylor Depo. at Ex. 11). His complained-of negative evaluation was done on August 28, 1998. (Doc. 15 at Tab 8).

---

[36] The amendment is also found at Taylor Depo, Ex. 11.

Even accepting, as this court must at this juncture, that Hamilton told Higdon to give Taylor a bad evaluation so that he would resign, this had to have occurred before the August 28, 1998 evaluation, and before the evidence indicates that Hamilton would have had knowledge that Taylor engaged in a protected activity.  Assuming that Taylor made appropriate claims of racial and sexual discrimination and harassment to Clemon and Pruett, there is no evidence that Hamilton was aware of them.  She was aware of his dissatisfaction with not being interviewed and not receiving a senior accountant position, as well as his other complaints of mistreatment, but there is no evidence that she was aware that his claims were based on race or gender until, as best this court can discern, until September 22, 1998.  Even the most liberal construction of the evidence only brings that date back to September 1, 1998.  The evidence does not show any communication of his allegations of discrimination by Clemon and Pruett before then.

Regarding the second element, as already discussed, the plaintiff has not shown that he suffered an adverse employment action after he made the complaints of race and gender discrimination and harassment.[37]

## VI.    CONCLUSION

Based on the foregoing, the court finds that the defendants' motion to strike (doc. 16) is due to be granted in part and denied in part and the defendants' motion for summary judgment (doc. 17) is due to be granted.   An appropriate order will be entered.

DONE, this 29th day of April, 2002.

JOHN E. OTT
United States Magistrate Judge

---

[37] Although the record does establish that Hamilton singled his application and resume out for review and that she presented the purported discrepancies to Pruett in Human Resources, no action was taken against him.

40